IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CP STONE FORT HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16 C 4991 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| JOHN DOE(S), | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff CP Stone Fort Holdings, LLC has brought a one count complaint against certain John Doe defendants alleging that defendants engaged in a scheme to manipulate the United States Treasury Markets in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rules 10b-5(a) and 10b-5(c) promulgated thereunder. Defendant John Doe #1 has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that: (1) plaintiff lacks prudential standing to sue; (2) the claim is barred by the applicable statute of repose; and (3) the complaint fails to allege scienter or manipulation, and fails to allege that plaintiff relied on any particular "Deceptive Order."[1] For the reasons described below, defendant's motion to dismiss is granted.

---

[1] Plaintiff does not yet know the names of the Doe defendants because trading in the secondary U.S. Treasury Markets is anonymous. John Doe #1's motion to dismiss triggered the Private Securities Litigation Reform Act's ("PSLRA") automatic stay of discovery. 15 U.S.C. § 78u-4(b)(3)(B). The court denied plaintiff's request to lift the stay pending resolution of the instant motion to dismiss.

# FACTS[2]

According to the complaint, plaintiff is the "assignee of the claims at issue in this action." Caherciveen Partners, LLC assigned the claims to plaintiff in 2015. As assignee of Caherciveen, plaintiff purports to bring the claims based on Caherciveen's trading activity in Treasury Notes with maturities of 2, 3, 5, 7 and 10 years, and 30-year Treasury bonds.

Defendants are persons or entities that trade electronically in the U.S. Treasury securities markets. Participants that trade in these markets typically use one of two primary electronic platforms: (1) BrokerTech (owned and operated by ICAP, plc); and (2) eSpeed (owned and operated by Nasdaq, Inc.). Both platforms require participants to identify themselves by use of a unique operator identification, and each platform assigns an identifier when orders are matched with a counter-party.

Orders entered through each platform become part of their "order books," which are displayed electronically to market participants. The order books display the total quantities available at the best prices on both the buy and sell side for each security. The highest available price for buy orders is referred to as "top of the book bid." The lowest available price for sell orders is referred to as the "top of the book offer." The order books also display the total available order volume to all market participants. When buy and sell orders for a particular security are pending at the same price, the platforms assign a queue priority to those orders based on the time in which the orders were entered. The platforms then match buy orders with sell

---

[2]The facts are taken from plaintiff's complaint and are presumed true for purposes of evaluating defendant's motion to dismiss. Murphy v. Walker, 51 F.3d 714, 717 (7th Cir. 1995).

orders by time priority using the "first in, first out" method. The oldest ordered entered is matched first for execution of a trade.

The complaint alleges that defendants manipulated the U.S. Treasury markets by submitting orders to the platforms that defendants never intended to have executed. These "Deceptive Orders" were intended to create the false appearance of market demand in a certain direction (to either buy or sell) when in actuality the demand did not exist. The Deceptive Orders "lured other market participants into entering sell orders below, or entering buy orders above, or maintaining positions below or above, what would otherwise be the prevailing market price based on what other market participants thought was a change in the supply and demand balance in the product." The defendants then "flashed" the market by cancelling the "Deceptive Orders" and simultaneously entering "Aggressor Orders" in the opposite direction for the same security at the same price. Those Aggressor Orders where then matched and executed with bids or offers of other market participants that were made in response to the Deceptive Orders. By doing this, plaintiff alleges that the defendants were able to sell U.S. Treasury notes and bonds at artificially high prices, and buy U.S. Treasury notes and bonds at artificially low prices.

Plaintiff alleges that defendants' manipulation is characterized by a "well defined pattern." First, defendants entered the Deceptive Orders. While these orders were on the order book (the "build-up phase") they created a false appearance of market depth and momentum in one direction. The Deceptive Orders typically represented "a significant portion of the market" often consisting of more than 25% of the posted size of the best available price." Defendants then cancelled the Deceptive Orders and "virtually simultaneous to the cancels," would enter one or more Aggressor Orders in the opposite direction but at the same price as the Deceptive

3

Orders, thereby trading "against the remaining available securities at that price (the "flash phase")."

According to plaintiff, it is this well defined pattern, and the frequency, speed, and precision with which the build-up and flash progression took place, that "eliminates the possibility that this pattern was anything other than orchestrated." Plaintiff alleges that the fact that the cancel orders and the "flash" orders occurred within milliseconds evidences a premeditated coordination, because defendants "could not have legitimately changed their mind as to the direction of the market so quickly, so often and with such precision." Additionally, the fact that defendants typically cancelled Deceptive Orders across multiple markets of U.S. Treasury securities in multiple product markets including U.S. Treasury futures markets offered on the Chicago Board of Trade ("CBOT") demonstrates defendants' intent to manipulate the market for U.S. Treasury securities.

## DISCUSSION

**1.     Standing**

Rule 10b-5 actions are tightly restricted to persons who are either purchasers or sellers of securities. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 740-47 (1975). This restriction is required because permitting plaintiffs that did not buy or sell securities to maintain actions would encourage nuisance litigation and promote vexatious litigation that could depend on uncorroborated, self-servicing testimony. Id.

Defendant challenges plaintiffs' standing because the complaint does not allege that plaintiff purchased or sold any securities. Instead, plaintiff alleges that it is the assignee of Caherciveen's claims and brings the suit based on Caherciveen's trading activity. Defendant

challenges that assignment as inoperable as a matter of law, and claims that the alleged assignment raises the same concerns that led to the Supreme Court's decision in Blue Chip. See Smith v. Ayers, 977 F.2d 946, 950 (1992). According to defendant, assignments for the purpose of bringing a 10b-5 claims are inherently problematic because they raise procedural issues that prejudice the defendants' ability to litigate the case, as well as the court's ability to adjudicate it. See In re: B.P. p.l.c. Sec. Litig., 2016 WL 29300, *5 (S.D. Tex. Jan. 4, 2016). Defendant argues that because of the assignment, it will have limited rights to obtain information from Caherciveen, which is not a party to the case. Id. It also argues that if plaintiff is just a litigation vehicle, it could simply "dissolve itself out of existence if the Court attempted to sanction it." Id. at *6 n.43. Because assignment raises all the concerns that led the Blue Chip court to restrict 10b-5 claims to purchasers or sellers, defendant argues that courts permit express assignment of 10b-5 claims only in "extremely rare" circumstances. See Aviva Life And Annuity Co. v. Davis, 20 F.Supp.3d 694, 702 (S.D. Iowa 2014).

Plaintiff counters that defendant's standing argument is a challenge to subject matter jurisdiction more properly brought under Fed. R. Civ. P. 12(b)(1), which allows the court to consider matters outside the four corners of the complaint. Therefore, plaintiff submits an affidavit explaining that in April 2015 Caherciveen had eleven members that collectively owned 100% of the company. By May 2016, all eleven decided to sell their collective membership interests to a third party. Those selling members wanted to retain their right to pursue the instant claims of illegal market manipulation, so they and the third party purchaser agreed that prior to the execution of the sale, the securities claims would be assigned to the selling members in a separate entity. The selling members formed plaintiff to receive assignment of the claims. Each

of the selling members acquired the same ownership interest in plaintiff that they had in Caherciveen. Thus, the purpose of the assignment was to allow the original members of Caherciveen, the persons who were actually damaged by the alleged manipulation, to bring suit.

Defendant responds that plaintiff "misunderstands" defendant's standing argument, the basis of which is that plaintiff lacks statutory or prudential standing to bring a 10b-5 claim, which does not raise a jurisdictional issue and is properly brought under Rule 12(b)(6). Defendant argues that plaintiff has failed to allege that it is among the "class of plaintiffs Congress has authorized to sue." Defendant further argues that because the motion is properly brought under Rule 12(b)(6), the court should strike and ignore the affidavit submitted with plaintiff's response.

Like plaintiff, the court viewed defendant's standing motion, considering its citation to Sprint Communications Co. L.P. v. APCC Servs., Inc. 554 U.S. 269, (2008), as raising both constitutional and prudential concerns, allowing plaintiff to offer evidentiary support for its position. But even if the court were to agree with defendant and grant its motion based solely on lack of statutory standing, it would allow plaintiff to replead the information contained in the affidavit. Therefore, the court considers the affidavit and in doing so concludes that the assignment was for a legitimate purpose and does not raise the concerns expressed in Blue Chip.

As noted recently by Judge Scheindlin of the Southern District of New York, "the Supreme Court has explicitly approved the practice of assigning claims for litigation purposes on both Article III and prudential grounds, recognizing the historical tradition of suits by assignees." B.G. Litig. Recovery I, LLC v. Barrick Gold Corp., __ F.Supp.3d __, 2016 WL 1587247, *9 (April 18, 2016)(quoting Sprint Comm., 554 U.S. at 285). Defendant has raised

nothing to suggest that the assignment is a sham designed to allow plaintiff and/or Caherciveen to avoid their litigation obligations under the Federal Rules of Civil Procedure or otherwise. And, even if the assignment presents certain discovery problems, "courts are not helpless in the face of such problems. For example, a district court can, if appropriate, compel a party to collect and produce whatever discovery-related information is necessary." Sprint Comm., 554 U.S. at 292.

Consequently, the court rejects defendant's argument that the assignment is inoperable as a matter of law and that plaintiff lacks standing.

**2.     Statute of Repose**

A federal securities law claim must be brought "not later than the earlier of – (1) 2 years after discovery of the facts constituting the violation; or (2) 5 years after such violation." The two year period begins to run once the plaintiff discovers, or could have discovered with reasonable diligence, the facts underlying the violation. Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 646-48 (2010).

A statute of limitations or repose is an affirmative defense that ordinarily must be pleaded and proved by the defendant. Fed. R. Civ. P. 8(c)(1); Jay E. Hayden Foundation v. First Neighbor Bank, N.A., 610 F.3d 382, 383 (7th Cir. 2010). "Complaints need not anticipate defenses and attempt to defeat them." Richards v. Mitcheff, 696 F.3d 635, 637 (7th Cir. 2012). As a result, the Seventh Circuit has often held that Rule 12(b)(6) is not designed for motions under Rule 8(c)(1). Id. (and cases cited therein). Nonetheless, "if it is plain from the complaint that the [statute of limitations] defense is indeed a bar to the suit dismissal is proper without further pleading." Jay E. Hayden, 610 F.3d at 383. The dismissal should be on the pleadings

7

under Rule 12(c), but that amounts "to the same thing as a dismissal under Rule 12(b)(6)." Richards, 696 F.3d at 637. Unless, however, "the complaint alleges facts that create an ironclad defense, a limitations argument must await factual development." Foss v. Bear, Sterns & Co., Inc., 394 F.3d 540, 542 (7th Cir. 2005).

In the instant case, defendant argues that the complaint alleges a "well defined pattern" of trading activity throughout 2013 and 2014, and that "the vast majority of the trades underlying [plaintiff's] claim – which Caherciveen knew of when they occurred and through public market data – occurred over two years before the complaint was filed" on May 5, 2016. Defendant points out that 80% of the trades made through BrokerTech, 85% made through eSpeed, and 79% of the trades made on the Chicago Mercantile Exchange occurred before May 5, 2014. Thus, defendant argues that Caherciveen, the counter-party for each trade, knew or should have known, of the purported scheme and "well defined pattern," no later than the end of 2013.

Plaintiff responds that under Merck, a plaintiff must uncover facts, or through the exercise of reasonable due diligence, should have uncovered facts, sufficient to plead each of the elements of the claim before the statute begins to run. To plead a fraud claim, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" demonstrating that "it is at least as likely as not that the defendant acted with the relevant knowledge and intent." Merck & Co., 559 U.S. at 649.

Plaintiff argues that none of the factual allegations in the complaint, and specifically the allegation that the pattern began in 2013, demonstrates that plaintiff knew that defendant was purposely engaging in manipulation. Thus, according to plaintiff, although Caherciveen had access to the raw data, nothing in the complaint suggests that it had discovered, or could have or

8

should have discovered through the exercise of reasonable diligence, the facts constituting the violation.

Although this is a close question, the court agrees with plaintiff that the complaint does not allege facts that create an "ironclad" defense. At most, the complaint alleges that Caherciveen was aware in 2013 that it was incurring losses, but nothing in the complaint demonstrates that it was or could have been aware that those losses were the result of market manipulation. Consequently, the court concludes that it is not plain from the complaint that the statute of repose is a bar to the suit, and denies defendant's motion to dismiss on this ground.

**3. Failure to State a Claim**

Defendant next argues that the complaint fails to plead facts sufficient to state a claim for a Rule 10b-5 violation. A motion to dismiss under Rule 12 (b)(6) challenges the sufficiency of the complaint, not its merits. Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990). The court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. Sprint Spectrum L.P. v. City of Carmel, Ind., 361 F.3d 998, 1001 (7th Cir. 2004). The complaint must allege sufficient facts that, if true, would raise a right to relief above the speculative level, showing that the claim is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 549, 555 (2007). To be plausible on its face, the complaint must plead facts sufficient for the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Because plaintiff's Section 10(b) claim sounds in fraud, it is also subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b), which provides that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

9

The complaint must provide "the who, what, when, where and how" of the alleged fraud. DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).

In addition to Rule 9(b), to check against pleading abuses in private securities fraud suits, the PSLRA has further heightened the pleading requirements. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314-15 (2007). In particular, the PSLRA imposes a substantially higher standard of pleading scienter. The complaint must "with respect to each act or omission . . . state with particularity facts giving rise to a strong inferences that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(3)j. The required state of mind is an "intent to deceive, manipulate or defraud." Higginbotham v. Baxter Int'l. Inc., 495 F.3d 753, 756 (7th Cir. 2007). For an inference to be "strong," it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324.

Plaintiff first attacks the complaint's sufficiency as to the allegations of scienter and manipulation. Because plaintiff claims that the allegations of manipulative activity create the strong inference of scienter, the court first analyzes the sufficiency of plaintiff's allegations of manipulation.

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . .." 15 U.S.C. § 78j(b). Rule 10b-5 clarifies that it is unlawful, in connection with the purchase or sale of any security:

(a) to employ any device, scheme or artifice to defraud;

(b) to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made, not misleading; or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

According to the Supreme Court, the word "manipulative" connotes "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976). "The term refers generally to practices as wash sales, match sales, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Santa Fe Indus. v. Green, 430 U.S. 462, 476 (1977).[3] Such conduct closely resembles fraud and is patently manipulative, serving no other purpose than to transmit false information to the market and thereby artificially affecting price. Manipulative intent can be inferred from the conduct itself. Masri, 523 F.Supp.3d at 367.

Defendant's alleged activity does not fall into those categories of patently manipulative conduct because, as plaintiff must admit, there is nothing improper or illegitimate about placing passive orders in the order book and then reversing position. Market manipulation can be accomplished through otherwise legal means, however, such as short sales, and large or carefully timed purchases or sales of securities. Id. The propriety of maintaining a manipulation claim in such "open market" cases where, as here, the activity is not expressly prohibited, is not fully settled. See id. That is because it involves the question whether "manipulative intent alone is enough to make open-market transactions manipulative and in violation of the securities laws." Id.

---

[3]"A wash sale is a sale of securities made at or about the same time as a purchase of the same securities . . . resulting in no change of beneficial ownership. A matched order is an order to buy and sell the same security, at about the same time, in about the same quantity, and at about the same price." S.E.C. v. Masri, 523 F.Supp.2d 361, 367 n.8, 9 (S.D.N.Y. 2007).

The Third Circuit has held that such intent is not alone sufficient to support a manipulation claim when the activity in question was otherwise legal. GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 204-05 (3d Cir. 2001). The GFL court concluded that to maintain a manipulation claim the plaintiff had to establish "that the alleged manipulator injected inaccurate information into the market or created a false impression of market activity. Id. at 205. "Such a construction permits courts to differentiate between legitimate trading activities that permissibly may influence prices, such as short sales, and `ingenious devices that might be used to manipulate securities prices' such as washed sales and matched orders." Id. (internal citations omitted).

In contrast, the D.C. Circuit took the opposite position, concluding that simply because the activity was legal did not mean that it was not illegally manipulative. "[M]anipulation can be illegal solely because of the actor's purpose." Markowski v. S.E.C., 274 F.3d 525, 529 (D.C. Circuit 2001)(relying on §9(a)(2) of the Exchange Act, which declared it unlawful to affect a series of transactions in any security creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.).

The Seventh Circuit has not directly addressed this issue. Its decision in Sullivan & Long, Inc. v. Scattered Corp., 47 F.3d 857 (7th Cir. 1995), concluding that a market maker was not guilty of manipulation by selling short even though he had sold short more shares than were outstanding, suggests that it might side with GFL. As the court noted in Sullivan & Long, 47 F.3d at 864 (internal citations omitted):

> As the plaintiffs themselves point out, the essence of the offense is creating a false impression of supply and demand, for example through wash sales, where parties

12

> fictitiously trade the same shares back and forth at higher and higher prices to fool the market into thinking that there is a lot of buying interest in the stock. There was nothing like that here. On the other side of all of Scattered's transactions were real buyers betting against Scattered, however foolishly, that the price of LTV stock would rise.

In the instant case, plaintiff argues that by placing the "Deceptive Orders" defendant has injected inaccurate information into the market place by creating the false appearance of: (a) a change in the supply and demand for the securities; (b) market depth; and (c) momentum in one direction or the other. As defendant argues, however, just calling an order deceptive does not make it so. According to the complaint, all of the so-called "Deceptive Orders" were passive, or resting orders, meaning they remained on the order book until they were either matched up with a counter-party offer, or cancelled. The way the platforms work, if a market participant enters an order to buy at the lowest offer, or to sell at the highest bid, that order will be matched with orders that were resting in the open book, starting with the oldest order. Thus, if the market contains orders to buy at 9 and offers to sell at 10, a prospective buyer can either join the other bidders at 9 by placing a passive order and wait to be matched, or it can buy immediately by placing an aggressive order to buy at 10.

In this sense, all of the offers or bids were legitimate and could have been matched at any time by a willing participant placing an aggressive order. And, had they been so matched, the market reaction would have been legitimate. Indeed, the complaint is devoid of any allegation that defendant refused to execute on any matched orders. Nor is there any allegation of how many orders were executed, how long the ultimately cancelled orders had remained resting and available for execution prior to cancellation, or whether the platform rules required the orders to be exposed further. Defendant is correct that plaintiff's theory boils down to an allegation that

13

"if a subset of orders was ultimately cancelled, those orders, in hindsight, must never have been intended to be executed."

Considering the heightened pleading requirements for security fraud cases, the court concludes that the complaint fails to allege anything more than legitimate trading activity that permissibly influences price. Because the complaint fails to allege illegal manipulation, it also fails to allege a strong inference of scienter. Consequently, the complaint fails to state a claim for a Rule 10b-5 violation and is dismissed.

## CONCLUSION

For the reasons stated above, defendant Doe #1's motion to dismiss (Doc. 14) is granted. Defendant Doe #1's motion to proceed anonymously (Doc. 16) is denied as moot.

**ENTER:** October 11, 2016

_____
**Robert W. Gettleman**
**United States District Judge**